533 S.E.2d 578

**Jim HODGES, Governor of the State
of South Carolina, Petitioner,**

**v.**

**John S. RAINEY, former Member and Chairman of
the Board of Directors of the South Carolina
Public Service Authority, Respondent.**

**No. 25149.**

Supreme Court of South Carolina.

Heard Feb. 15, 2000.

Decided June 12, 2000.

80

Chief Legal Counsel Jim O. Stuckey, II, of the Office of the Governor, of Columbia, and Susan Taylor Wall, of Nexsen, Pruet, Jacobs, Pollard & Robinson, LLP, of Charleston, for petitioner.

William C. Hubbard, Dwight F. Drake and C. Mitchell Brown, of Nelson Mullins Riley & Scarborough, L.L.P., of Columbia, for respondent.

TOAL, Justice:

Governor Jim Hodges ("Governor Hodges") initiated this action in the original jurisdiction of this Court pursuant to Rule 229, SCACR to clarify his authority to remove members of the Board of Directors of the South Carolina Public Service Authority ("Santee Cooper") pursuant to S.C.Code Ann. § 1–3–240(B) (Supp.1998).

## FACTS/PROCEDURAL BACKGROUND

In 1993, the South Carolina General Assembly adopted the Restructuring Act, which provided for a substantial reorganization of South Carolina state government. A key provision of the Restructuring Act was the grant to the Governor of broad discretionary authority to appoint and remove executive branch officials. These provisions allow the Governor the flexibility to assemble his or her management team. To this end, included in that act was section 1–3–240(B), which allows the Governor to remove any appointed state officer at his or her discretion, notwithstanding that the officer's term has not yet expired or that a substantial amount of time remains in the officer's term. When Governor Hodges was elected in 1999, he chose not to issue a broad executive order removing all state officers appointed by past governors. Instead, he requested the resignation of certain members of state boards and commissions. Governor Hodges requested that John S. Rainey ("Rainey") resign his position as Chairman of the Board of Directors of Santee Cooper. When Rainey refused, Governor Hodges issued Executive Order 99–62 removing Rainey from the Board. On December 8, 1999, Rainey sent a letter to Governor Hodges in which he refused to relinquish his office on the grounds that the 1993 Restructuring Act

granting the Governor discretionary power to remove state officers from their positions did not apply to him.

The sole issue before this Court is as follows:

Whether the Governor of South Carolina has the authority to remove a member of the Board of Directors of Santee Cooper upon the issuance of an executive order pursuant to S.C.Code Ann. § 1–3–240(B) (Supp.1998)?

## LAW/ANALYSIS

Governor Hodges argues that this Court should declare that the members of the Board of Directors of Santee Cooper are subject to the Governor's discretionary removal power under the provisions of the 1993 Restructuring Act and, thus, the executive order removing Rainey is effective. We agree.

## I. Statutory Construction

The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Charleston County Sch. Dist. v. State Budget and Control Bd.*, 313 S.C. 1, 437 S.E.2d 6 (1993). Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute. *In re Vincent J.*, 333 S.C. 233, 509 S.E.2d 261 (1998) (citations omitted). Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning. *Id.* at 233, 509 S.E.2d at 262 (citing *Paschal v. State Election Comm'n*, 317 S.C. 434, 454 S.E.2d 890 (1995)). "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature." Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed. 1992).

The language of section 1–3–240(B) and (C) is unambiguous and evidences the General Assembly's intent to grant the Governor of South Carolina the power to remove appointed state officers at his or her discretion. Specifically, section 1–3–240(B) provides for the general power to remove as follows:

(B) Any person appointed to a state office by a Governor, either with or without the advice and consent of the Senate, other than those officers enumerated in subsection (C), may be removed from office by the Governor at his discretion by an Executive Order removing the officer.

Immediately following is section 1–3–240(C) which provides for an enumerated list of agencies where the Governor's power of removal is limited:

(C) Persons appointed to the following offices of the State may be removed by the Governor for malfeasance, misfeasance, incompetency, absenteeism, conflicts of interest, misconduct, persistent neglect of duty in office, or incapacity:

(1) Workers' Compensation Commission;

(2) Commission of the Department of Revenue;

(3) Ethics Commission;

(4) Election Commission;

(5) Professional and Occupational Licensing Board;

(6) Juvenile Parole Board;

(7) Probation, Parole and Pardon Board;

(8) Director of the Department of Safety;

(9) Board of the Department of Health and Environmental Control, excepting the Chairman;

(10) Chief of State Law Enforcement Division.

This Court has upheld the Restructuring Act and has applied the above set forth sections 1–3–240(B) and (C) to other directors of state boards and commissions. *See, e.g., Rose v. Beasley,* 327 S.C. 197, 489 S.E.2d 625 (1997) (affirming Governor Beasley's removal of Boykin Rose from the office of Director of Department of Public Safety under section 1–3–240(C)).

▮ The canon of construction *"expressio unius est exclusio alterius"* or *"inclusio unius est exclusio alterius"* holds that "to express or include one thing implies the exclusion of another, or of the alternative." Black's Law Dictionary 602 (7th ed. 1999). Section 1–3–240(C) does not specifically exempt the Santee Cooper Board of Directors from its operation, as it

does ten other boards. The fact that the Santee Cooper Board of Directors was not included in the list of exclusions implies that the General Assembly intended for section 1-3-240(B) to apply to the Board. "The enumeration of exclusions from the operation of a statute indicates that the statute should apply to all cases not specifically excluded. Exceptions strengthen the force of the general law and enumeration weakens it as to things not expressed." Norman J. Singer, *Sutherland Statutory Construction* § 47.23 at 227 (5th ed. 1992) (citations omitted).

 The text of the Restructuring Act is certain—the Act grants the Governor the right to remove appointed state officers at his or her discretion, while specifically exempting ten boards and commissions. If the legislature's intent is clearly apparent from the statutory language, a court may not embark upon a search for it outside the statute. *Abell v. Bell,* 229 S.C. 1, 91 S.E.2d 548 (1956). When the language of a statute is clear and explicit, a court cannot rewrite the statute and inject matters into it which are not in the legislature's language, and there is no need to resort to statutory interpretation or legislative intent to determine its meaning. *Timmons v. South Carolina Tricentennial Comm'n,* 254 S.C. 378, 175 S.E.2d 805 (1970).

 While it is true that the purpose of an enactment will prevail over the literal import of the statute, this does not mean that this Court can completely rewrite a plain statute. According to this Court in *South Carolina Board of Dental Examiners v. Breeland:*

A choice of language in a act will not be construed with literality when to do so will defeat the lawmakers' manifest intention, and a court will reject the ordinary meaning of words used in a statute when, to accept the ordinary meaning, will lead to a result so plainly absurd that it can not possibly have been intended by the legislature.

208 S.C. 469, 480, 38 S.E.2d 644, 650 (1946) (citations omitted). For example, this Court has interpreted statutes in accord with legislative intent despite contrary literal meaning in cases where there has been an oversight by the legislature that is clearly in conflict with the overall intent of the statute, such as when the legislature uses "or" instead of "and" or "county"

instead of "city." [1] However, this Court should not completely disregard the text of an unambiguous statute based on an alleged conflict with an earlier statute. In the instant case, the ordinary meaning of section 1–3–240(B) will not lead to absurd results unintended by the legislature, so the plain language of the statute should not be disregarded.

## II. Implied Repeal

Rainey argues that section 1–3–240(B) is in conflict with Santee Cooper's enabling legislation that allows for the removal of board members for cause, S.C.Code Ann. § 58–31–20 (Supp.1998) [2]. According to Rainey, section 1–3–240(B) should not be read according to its literal meaning because the legislature did not intend for section 1–3–240(B) to "impliedly repeal" Santee Cooper's 1934 enabling legislation. Rainey maintains that because the two statutes are in inherent conflict, this Court should not apply section 1–3–240(B) to Santee Cooper, even though its Board of Directors were not specifically listed in the section 1–3–240(C) exclusions. We disagree.

The law does not favor the implied repeal of statute. *Butler v. Unisun Ins.*, 323 S.C. 402, 475 S.E.2d 758 (1996). Statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative. *Id.* "It is presumed that the Legislature is familiar with prior legislation, and that if it intends to repeal existing laws it would ... expressly do so; hence, if by any fair or liberal

---

1. Rainey cites several examples where this Court has interpreted statutes in accord with legislative intent, despite the literal meaning of the statute. However, in none of these examples has this Court completely disregarded the plain meaning of the statute. In all of his examples this Court changed particular words to be more in line with the overall intent of the statute. None of his examples involve this Court disregarding the whole text of a statute because a contrary legislative intent can be ascertained from reading other earlier statutes, which is what Rainey argues this Court should do in the instant case. The examples provided by Rainey include where this Court has found: "July" to mean "June;" "attached" to mean "taxed;" "county" to mean "city;" and "hereinafter" to mean "hereinbefore." *See generally Fulghum v. Bleakley*, 177 S.C. 286, 181 S.E. 30, 32 (1935); *Robson v. Cantwell*, 143 S.C. 104, 141 S.E 180 (1928).

2. "Members of the board of directors may be removed for cause by the advisory board or a majority thereof." S.C.Code Ann. § 58–31–20 (1976).

construction two acts may be made to harmonize, no court is justified in deciding that the later repealed the first." *Justice v. Pantry*, 330 S.C. 37, 43–44, 496 S.E.2d 871, 874 (Ct.App. 1998) (quoting *State v. Hood*, 181 S.C. 488, 491, 188 S.E. 134, 136 (1936)).

 In the instant case, we find that the 1934 Santee Cooper enabling legislation and the 1993 Restructuring Act are not in conflict. On the contrary, section 1–3–240(B) and (C) of the Restructuring Act can be reconciled with section 58–31–20 of the Santee Cooper legislation because both statutes provide alternative and complimentary means of removal.[3] In fact, it is very logical to have both statutes in effect because the provision in the Santee Cooper Act (section 58–31–20) acts as an important safety net. Pursuant to section 58–31–20 of the Santee Cooper Act, the advisory board can remove a board member for cause, which allows the advisory board to remove a member who is not properly performing in the event the Governor fails to do so. For example, if the Governor decides to appoint a political ally to the board who commits some type of malfeasance, section 58–31–20 acts as the ultimate safety net by permitting the advisory board to remove the Governor's appointee.

Section 1–3–240(B) of the Restructuring Act does not affect the advisory board's removal power, it merely allows the Governor to remove a director at his or her discretion. As a matter of public policy, the Governor's discretionary removal power is important because it allows the Governor to remove a director with whom he or she cannot work. Moreover, the Restructuring Act states that the Governor's removal power is not in conflict with other removal provisions because it is merely additional to any removal powers conferred by other statutes. S.C.Code Ann. § 1–3–260 (1976) ("The power and procedure of removal conferred and provided for in §§ 1–3–240 and 1–3–250 are *additional* to any other removal powers or procedure authorized by statute.") (emphasis added).

---

3. Even if the Restructuring Act was incompatible with Santee Cooper's enabling legislation, the Restructuring Act would prevail because it was enacted subsequent to the enabling legislation. The more recent and specific legislation controls if there is a conflict between two statutes. *Porter v. South Carolina Pub. Serv. Comm'n*, 327 S.C. 220, 489 S.E.2d 467 (1997).

## III. State Office

■ Governor Hodges argues that section 1–3–240(B) applies to the Santee Cooper Board of Directors because Santee Cooper is a state agency and, therefore, the office of its board members is a "state office" for purposes of the statute. We agree.

Pursuant to section 1–3–240(B), state officers can be removed by the Governor at his discretion. Rainey argues that section 1–3–240(B) does not apply to Santee Cooper's board members because Santee Cooper's enabling legislation provides that they are not "public officers." Section 58–31–60 of Santee Cooper's 1934 enabling legislation provides:

> *The position of director of the Public Service Authority is not a public office,* and the State shall in no way be responsible for the acts of the directors, but each director and his surety and the Public Service Authority shall be responsible for all acts of the director in connection with the functions herein provided for.

S.C.Code Ann. § 58–31–60 (1976) (emphasis added).

General law on this subject provides that public officers are "all officers of the State that have heretofore been commissioned and trustees of the various colleges of the State, members of various State boards and other persons whose duties are defined by law." S.C.Code Ann. § 8–1–10 (1976). However, Santee Cooper's directors have many indicia of public office holders. The directors are appointed by the Governor, they are commissioned, and their duties are defined by law. Santee Cooper is also considered a state agency under current statutory law.[4] Under current law, Santee Cooper "is a corporation owned completely by the people of the State" for a "public purpose" and is operated "for the benefit of the all the people of the State." S.C.Code Ann.

---

4. South Carolina case law also confirms that Santee Cooper is a state agency. *See Cooper v. South Carolina Pub. Serv. Auth.,* 264 S.C. 332, 215 S.E.2d 197 (1975) (Public Service Authority is "a public corporation in the nature of a quasi municipal corporation, exercising certain governmental functions as an agency of the state."); *Creech v. South Carolina Pub. Serv. Auth.,* 200 S.C. 127, 20 S.E.2d 645 (1942), *superseded by statute on other grounds,* 311 S.C. 417, 429 S.E.2d 802 (1993) ("South Carolina Public Service Authority is a public corporation, exercising certain governmental functions as an agency of the State").

§ 59–31–80 (Supp.1998). Santee Cooper also enjoys the many benefits and protections of a state agency, such as: (1) the power of eminent domain, S.C.Code Ann. § 58–31–30(18) (Supp.1998); (2) protection under the South Carolina Tort Claims Act, S.C.Code Ann. § 15–78–40 (Supp.1998); and (3) protection under the Freedom of Information Act, S.C.Code Ann. § 30–4–10 (Supp.1998). Thus, we are faced with the question of how to harmonize various sections of law with respect to the status of Santee Cooper's directors.

The goal of statutory construction is to harmonize conflicting statutes whenever possible and to prevent an interpretation that would lead to a result that is plainly absurd. *Ray Bell Constr. Co. v. School Dist. of Greenville Co.*, 331 S.C. 19, 501 S.E.2d 725 (1998).

> However plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention. If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect.

*Id.* (citing *Kiriakides v. United Artists Communications, Inc.*, 312 S.C. 271, 440 S.E.2d 364 (1994)). If one examines section 58–31–60 of Santee Cooper's enabling legislation in context it is clear that it deals specifically with director liability. Specifically, section 58–31–60 states that "the State shall in no way be responsible for the acts of the directors, but each director and his surety and the Public Service Authority shall be responsible for all acts of the director in connection with the functions herein provided for." Section 58–31–60 limits the State's liability for the individual wrongs committed by directors, such as fraudulent acts. This statute is given limited effect because it was intended to apply solely to director liability prior to the South Carolina Tort Claims Act. If this Court were to give section 58–31–60 broad effect and decline to classify Santee Cooper's board members as state officers, such interpretation would lead to an absurd result where board members are classified as state officers under statutes that protect Santee Cooper as a state agency, such as the South Carolina Tort Claims Act and the Freedom of Informa-

tion Act, and not classified as state officers where that classification might not be beneficial, such as in the instant case.

Furthermore, in 1934 when Santee Cooper's enabling legislation was enacted, the State was protected by total sovereign immunity and could only be sued in tort or in contract when the State consented. The 1934 Act, therefore, offered Santee Cooper bondholders protection because it provided that although bondholders could not sue the State, they could sue both the directors and Santee Cooper on their bonds. S.C.Code Ann. § 58–31–60 ("... each director and his surety and the Public Service Authority shall be responsible for all acts of the director in connection with the functions herein provided for."). We eliminated the State's immunity from suit based upon its contractual obligation in 1978 in *Kinsey Construction Co. v. South Carolina Department of Mental Health,* 272 S.C. 168, 249 S.E.2d 900 (1978). In 1985, we abolished total sovereign immunity with respect to torts in *McCall v. Batson,* 285 S.C. 243, 329 S.E.2d 741 (1985). In response to *McCall,* the legislature passed the Tort Claims Act, which waived sovereign immunity under certain circumstances. Under the current law, it would be illogical to find that Santee Cooper's directors were not state officers because they would not be protected by the Tort Claims Act and potentially would be personally liable on Santee Cooper's bonds, as they arguably were under the 1934 enabling legislation.

Rainey argues that Santee Cooper should be considered a state agency for some purposes and not for others. In *South Carolina Pub. Serv. Auth. v. Citizens & South. Nat. Bank,* 300 S.C. 142, 160, 386 S.E.2d 775, 786 (1989), this Court held "Santee Cooper is a unique state agency ... Santee Cooper has been held to be a quasi-municipal corporation that is for some purposes an agency of South Carolina." Rainey argues that for some purposes and under some statutes Santee Cooper will be considered a state agency, depending on the statute's own distinct legislative history and meaning. Rainey cannot choose which statutes will classify Santee Cooper as a state agency based upon how advantageous that classification will be to him. Because current case law and statutory law classify Santee Cooper a state agency, Santee Cooper's Board of Directors should be considered state officers for purposes of section 1–3–240(B).

## IV. Contracts Clause

Rainey argues that section 1–3–240(B) would be unconstitutional in application if used to remove a Santee Cooper board member because it would violate the Contract Clause of the United States and South Carolina Constitutions [5] by impairing the contractual rights of Santee Cooper bondholders. To constitute a Contract Clause violation this Court must determine three issues: (1) whether there is a contractual relationship; (2) whether the change in the law impairs that contractual relationship; and (3) whether the impairment is substantial. *See General Motors Corp. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). Finally, "[f]or a law to survive scrutiny under the Contract Clause when the law substantially impairs a contract, it must be reasonable and necessary to accomplish a legitimate public purpose." *Ken Moorhead Oil Co. v. Federated Mutual Ins. Co.,* 323 S.C. 532, 542, 476 S.E.2d 481, 486 (1996) (citations omitted).

### A. Contractual Relationship

"When bonds are issued, there arises a contract between the purchaser and seller, the obligation of which cannot be impaired, as it would be in violation of article 1, § 10, Const. U.S., and of article 1, § 8, Const. S.C." *Welch v. Getzen,* 85 S.C. 156, 67 S.E. 294 (1910); *see also South Carolina Pub. Serv. Auth. v. Summers,* 282 S.C. 148, 318 S.E.2d 113 (1984) (holding municipal tax assessment impaired rights of holders of bonds issued by Santee Cooper in violation of the United States and State Constitutions). Santee Cooper is the seller of its bonds. The contract exists between the bondholders and *Santee Cooper,* not its *Board of Directors.* Therefore, any change in the Board of Directors does not affect the underlying contract with Santee Cooper. If that

---

5. Article 1, section 10 of the United States Constitution provides:

No State shall · enter into any Treaty, Alliance, or Confederation; grant Letters or Marque and Reprisal; coin Money, emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto law, or *Law impairing the Obligation of Contracts,* or grant any Title of Nobility. U.S. Const. art. I, § 10, cl. 1 (emphasis added). *See* S.C. Const. art. I, § 4.

were the case, every time the Board of Directors changed, a contractual impairment would occur.

## B. Substantial Impairment

"For purposes of Contract Clause analysis, a statute can be said to substantially impair a contract when it alters the reasonable expectations of the contracting parties." *Ken Moorhead Oil,* 323 S.C. at 542, 476 S.E.2d at 486. A change in the composition of Santee Cooper's Board of Directors for any reason does not alter the reasonable expectations of the bondholders. Rainey argues that the "bondholders could reasonably expect that the rights of Santee Cooper, including the right to a stable board (which in turn translates into stable management) whose members may only be removed for cause by the Advisory Board, would not be altered or limited until after the bonds were retired." Rainey argues that the Governor's discretionary removal of the Chairman of Santee Cooper constitutes a threat to the stability of Santee Cooper, which may result in a lowering of the value of the bonds. According to Rainey, affecting the Board of Director's stability will have adverse effects on: (1) Santee Cooper's favorable bond ratings; (2) the bond's attractiveness to buyers; (3) the marketability of the outstanding Santee Cooper debt securities; and (4) increased credit insurance costs.

The adverse effects proposed by Rainey do not rise to the level of a substantial impairment of contract.[6] A change in the composition of the Board of Directors, as a result of the Governor's will, death of a member, retirement, or removal for

---

6. If the adverse effects cited by Rainey are considered an impairment, they certainly do not constitute a substantial impairment. In fact, the affidavits used by Rainey to support his claim of impairment do not describe substantial or highly detrimental effects as the result of a change in the composition of the Board of Directors. For example, in the affidavit of Walter T. Cox he states that the removal of the Chairman by the Governor is a threat to stability which "may result" in the bonds being less valuable if it affects the overall bond ratings. The affidavit of Alan Spen, who has rated Santee Cooper's bond offerings, merely states that the possibility that the Board could be replaced by the Governor is "viewed as less than favorable." Finally, the affidavit of Christopher Fink of Morgan Stanley & Company merely states that the possibility of removing the Chairman prior to the expiration of his term will lead to uncertainty which *"could have* a negative impact on the marketability of the outstanding Santee Cooper debt securities." (emphasis added).

cause, would not lead to the vast instability that Rainey proposes. The Board of Directors would still be able to function and the outstanding bonds would still exist. Rainey has supplied no evidence that the value of the outstanding bonds would be affected by the Governor's removal of a board member. He merely provides affidavits that speculate about the possibility of a change in bond value if the bond ratings are adversely affected by a change in the Board composition.[7]

## CONCLUSION

We find that the members of Santee Cooper's Board of Directors are subject to the Governor's discretionary removal power under section 1–3–240(B) of the 1993 Restructuring Act and, thus, Governor Hodges' executive order removing Rainey is effective.

MOORE, and WALLER, JJ., concur.

FINNEY, C.J., and BURNETT, J., dissenting in a separate opinion.

BURNETT, Justice (concurring in part, dissenting in part):

I concur with Parts III and IV of the majority's opinion. I disagree, however, with Parts I and II. In my opinion, the Governor does not have discretionary authority to remove a member of the Board of Directors of Santee Cooper.

Relying on the statutory construction maxim *"expressio unius est exclusio alterius,"* the majority concludes because Santee Cooper was not included in the list of exclusions noted in § 1–3–240(C), the General Assembly intended the Gover-

---

7. Rainey attempts to compare the instant case with *South Carolina Serv. Auth. v. Summers,* 282 S.C. 148, 318 S.E.2d 113 (1984) where this Court held that the imposition of an *ad valorem* tax on Santee Cooper's property violated the Contract Clause because it violated the statutory tax exemption granted to Santee Cooper. *Summers* is not analogous to the instant case because it involves the imposition of a tax, which clearly impairs the security provision provided to bondholders and violates the covenant made by the State not to alter any rights of Santee Cooper. *See* S.C.Code Ann. § 58–31–30 (1976).

nor's discretionary removal power to apply to the Board of Santee Cooper. The majority's application of the maxim improperly effects an implied repeal of Santee Cooper's enabling legislation.[1]

When Santee Cooper was created in 1934, the General Assembly enacted specific provisions for the removal of Santee Cooper's Board members. Section 58–31–20 (1976) specifically provides: "[m]embers of the board of directors [of Santee Cooper] may be removed *for cause* by the advisory board or a majority thereof." (Italic added). The advisory board is composed of five members, *one of whom is the governor.* § 58–31–20.

As recognized by the majority, the law does not favor the implied repeal of a statute. *Butler v. Unisun Ins.*, 323 S.C. 402, 475 S.E.2d 758 (1996). Nonetheless, the majority concludes § 1–3–240(B) and § 58–31–20 are not in conflict; § 58–31–20 simply acts as a "safety net" allowing the advisory board to remove the governor's appointee if he commits some type of malfeasance.

As I read § 1–3–240(B) and § 58–31–20, the two statutes are irreconcilable and cannot be reasonably harmonized. Allowing the Governor complete and sole discretion to remove a Board member without cause usurps the advisory board's authority to remove a Board member for cause. Simply put, if the advisory board, of which the Governor is a member, fails to remove a Board member for cause, the Governor can effectively veto the action and remove the member at his own discretion. Contrary to the majority's assertion, § 1–3–240(B) impliedly repeals the advisory board's removal power.

Because § 1–3–240(B) and § 58–31–20 are clearly in conflict, the latter, as the specific act, controls, even though it was passed before § 1–3–240(B). *Atlas Food Systems and Services, Inc. v. Crane Nat'l Vendors*, 319 S.C. 556, 462 S.E.2d 858 (1995); *see* Norman J. Singer, *Sutherland Statutory Con-*

---

**1.** *Expressio unius est exclusio alterius* is a rule of statutory construction; it is not a rule of substantive law. Accordingly, the maxim "should be used with care." Norman J. Singer, *Sutherland Statutory Construction* § 47.25 at 234 (5th ed. 1992).

*struction* § 51.05 at 174 (5ᵗʰ ed. 1992) ("[w]here one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, . . .").

Furthermore, the cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Mid–State Auto Auction of Lexington, Inc. v. Altman*, 324 S.C. 65, 476 S.E.2d 690 (1996). When it passed the Restructuring Act, the General Assembly amended the removal provisions of administrative agencies, specifically stating removal is subject to § 1–3–240(B). *See* § 24–1–40 (Supp.1999) (director of Department of Corrections is subject to removal from office as provided in § 1–3–240); § 44–9–30 (Supp.1999) (governing board of State Department of Mental Health may be removed by Governor pursuant to § 1–3–240); § 44–49–20 (Supp.1999) (director of Department of Alcohol and Other Drug Abuse Services is subject to removal by Governor pursuant to § 1–3–240); § 48–4–30 (Supp.1999) (Governor may remove any board member of the Department of Natural Resources pursuant to § 1–3–240); § 51–1–10 (Supp.1999) (director of Parks, Recreation and Tourism is subject to removal by the Governor pursuant to § 1–3–240). The legislature's failure to amend § 58–31–20 indicates a conscious decision by the General Assembly to exclude the Santee Cooper Board from the Governor's removal power in § 1–3–240(B).

In my opinion, § 1–3–240 does not authorize the Governor to remove a member of the Santee Cooper Board at his sole discretion. Accordingly, I would vacate Executive Order 99–62 which removes Rainey from the Board. *Rose v. Beasley*, 327 S.C. 197, 489 S.E.2d 625 (1997) (under South Carolina law, the Governor may not remove from office unless the power to do so is conferred upon him by the Constitution or statute).

FINNEY, C.J., concurs.